AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>MICHAEL CONDITO,<br>  aka "Michael Kevin Condito"<br>  aka "Michael Kevin Thomas Condito,"<br><br>Defendant(s) | Case No.  2:22-mj-02371-DUTY |

LODGED
CLERK, U.S. DISTRICT COURT
6/16/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
6/16/22
CENTRAL DISTRICT OF CALIFORNIA
BY: ___eb___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of September 26, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | Possession With Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

   ☒ Continued on the attached sheet.

/s/ Barrett Warren
*Complainant's signature*

Barrett Warren
Special Agent, Drug Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   6/16/22

*Judge's signature*

City and state:   Los Angeles, California           Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

**AFFIDAVIT**

I, Barrett Warren, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against MICHAEL CONDITO, also known as ("aka") "Michael Kevin Condito," aka "Michael Kevin Thomas Condito," ("CONDITO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the person of CONDITO, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

1. I am a Special Agent with the DEA currently assigned to the Los Angeles Field Division ("LAFD") Group 1. I have been employed as a Special Agent since April 2019.

2. I received and completed formal training that included a 16-week DEA training program in Quantico, Virginia. I have specialized training and experience in the investigation of major narcotics trafficking organizations involved in violent crime, racketeering, conspiracy crimes, and narcotics importation and distribution. I have participated in the debriefing of defendants and informants who had personal knowledge regarding major narcotics trafficking organizations, including cartels based in Mexico. Additionally, I have participated in many aspects of drug investigations, including the conducting of surveillance and court-ordered interceptions of wire communications. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement, such as the use of multiple cellphones, pre-paid calling cards, counter-surveillance measures, established relationships with legitimate businesses to hide drugs and launder drug proceeds, vehicles with concealed

compartments, false or fictitious identities, and coded and/or vague communications and conversations over cellphones, including text messages.

### III. SUMMARY OF PROBABLE CAUSE

3. On September 26, 2021, Torrance Police Department ("TPD") officers conducted a felony traffic stop of Michael CONDITO ("CONDITO") after observing that the license plate of the vehicle he was driving matched the license of a stolen vehicle in the area. CONDITO provided his name, consented to the officers searching the car for his driver's license, and appeared to be under the influence of drugs.

4. During a search of the car, officers discovered approximately two clear plastic baggies containing a white crystalline substance believed to contain methamphetamine, and thousands of various other pills, including ones believed to contain alprazolam (Xanax), along with drug paraphernalia, miscellaneous U.S. dollar bills, and other evidence of drug trafficking. Certain of the seized substances have since tested positive for methamphetamine and cocaine.

5. Officers also seized two cellular telephones from CONDITO's car, one of which was found to contain messages evidencing extensive narcotics dealing.

### IV. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I believe the following:

### A. Traffic Stop of CONDITO

7. On September 26, 2021, at approximately 8:06 a.m., TPD Officer Dahl was patrolling in a marked police car in the City of Torrance. Dispatch reported that a stolen 2014 Silver Subaru Impreza with California license plate number 8NHU877 was heading westbound on Del Amo Blvd. The car had been reported stolen to the San Jose Police Department on September 23, 2021.

8. Officer Dahl observed a Subaru with that license plate on Del Amo Blvd with a large object hanging from the windshield clearly obstructing the driver's view in violation of California Vehicle Code Section 26708(a). Officer Dahl ran the license plate to confirm it was the one that had been reported stolen, and then initiated a traffic stop. Officer Dahl ordered the driver, who later identified himself as CONDITO, out of the car. CONDITO complied and was handcuffed and detained in the back seat of the patrol car.

### B. Search of CONDITO's vehicle

9. TPD Officer Mathes obtained verbal consent from CONDITO to retrieve his ID from the car to confirm CONDITO's identity. While Officer Mathes was speaking to CONDITO, CONDITO appeared to be under the influence of a controlled substance.

10. Based on the verbal consent along with the observation that CONDITO had been driving under the influence, the officers searched CONDITO's car. While Officers Mathes and Dahl were looking for CONDITO's ID, Officer Dahl noticed several items, which, based on Officer Dahl's training and experience, are often possessed by individuals who use and sell narcotics.

Narcan was located in the middle console in plain view which, based on my training and experience, is commonly used by fentanyl users. In addition, in a black backpack on the passenger seat, officers also found several small clear plastic baggies (consistent with narcotic packaging), a black wallet with approximately $725 in a variety of denominations of US Currency, and two locked black nylon zip bags which felt like they contained multiple small pills. Law enforcement also recovered a black plastic box from the rear seat.

    11. The officers searched the rest of CONDITO's car and recovered, among other things:

    a. Inside the black box were approximately 1054 rectangular blue pills with "B707" imprinted on them and two fragments in a clear plastic bag; approximately 876 rectangular white pills with "Y" and "21" imprinted on them and 15 fragments in a clear plastic bag; approximately 600 rectangular yellow pills with "R039" imprinted on them and seven fragments in a clear plastic bag; 1701 rectangular yellow pills with "R039" imprinted on them and four fragments in a clear plastic bag.

    b. Inside two black nylon zip bags (from the backpack) were: approximately 1,463 rectangular blue pills with "B707" imprinted on them in a clear plastic bag; approximately 206 rectangular blue pills with "B707" imprinted on them in a clear plastic bag; approximately 310 rectangular yellow pills with "R309" imprinted on them in a clear plastic bag, among other things; two circular white pills with no markings and half pill in a rubber pill container; two small clear plastic baggies

containing a white powder resembling cocaine; a yellow powder located in a blue metallic bag; approximately 1946 rectangular white pills with "Y" and "21" imprinted on them in a clear plastic bag; one pink pill with an "8" imprinted on it located in small clear plastic bag; one pill capsule containing off white powdery substance; 18 Suboxone films[1]; and one clear plastic baggie containing a white crystalline substance resembling methamphetamine.  Based on Officer Dahl's training and experience, certain of these pills resembled Xanax bars.

       c.   In the trunk, in an unlocked black safe, there were two clear plastic baggies containing a white crystalline substance resembling methamphetamine.

       d.   A brown club approximately 18 inches in length with a grooved grip on one end with a black rope attached to it often times referred to as a "Tire Knocker" or "Billy Club," was recovered from the rear seat.

       e.   One phone was recovered from a cellular device phone mount on the windshield, and a second phone was recovered from inside the car connected to the charger.

12.  Officers were unable to locate CONDITO's identification in his vehicle.

13.  Officer Dahl placed CONDITO under arrest and charged him with violation of Health and Safety Code Sections 11375(b)(1) - Possession of Xanax for Sale, 11550 – Under the

---

[1] Based on my training and experience, a Suboxone film is a strip that can be administered under the tongue or inside the cheek to prevent withdrawal symptoms associated with opioid addiction.

Influence of a Controlled Substance, 11378 – Possession for Sale of a Controlled Substance; as well as California Penal Code 22210 – Possession of a Billy Club.

    **C.**    **CONDITO's Sobriety Test and Statements**

14.  Pursuant to a field test performed by Officer Dahl, CONDITO exhibited numerous signs of being under the influence of a controlled substance including dilated pupils, no reaction to light, irregular pulse, slow and slurred speech, confusion and sweating despite 66- degree weather.  CONDITO also stated he had taken a "Benzo" (which Officer Dahl understood as slang for benzodiazepines) within the past 24 hours.

15.  While in the back seat of Officer Dahl's patrol vehicle, Officer Dahl advised CONDITO of his Miranda Rights.  CONDITO then made statements said he was on his way back from a rave party in Arizona, confirmed the vehicle was his, and could not remember if he had reported it stolen or not.  CONDITO confirmed that everything inside the vehicle was his.

16.  During the booking process, CONDITO said the pills were Xanax and Clonazepam, and the white crystalline substance located in the black safe in the trunk of the vehicle was likely methamphetamine.

    **D.**    **Drug Testing**

17.  The narcotics were submitted to a DEA laboratory for testing, which came back with the following results, among others:

      a.    The two small clear plastic baggies containing a white powder resembling cocaine tested positive as .63 grams of a mixture and substance containing cocaine.

      b.    The pill capsule containing off white powdery substance tested positive as .110 grams of a mixture and substance containing MDMA/MDA.

      c.    The clear plastic baggie containing a white crystalline substance resembling methamphetamine tested positive as 1.137 grams of pure methamphetamine.

      d.    The two clear plastic baggies containing a white crystalline substance resembling methamphetamine (from the unlocked black safe in the trunk) tested positive as 55 grams of pure methamphetamine.

    **E.    Messages Relating to Narcotics Dealing Found on CONDITO's phone**

18.    On October 20, 2021, the Honorable Alexander F. MacKinnon, United States Magistrate Judge, issued a warrant authorizing the search of the two phones seized from CONDITO on September 26, 2021 by Torrance Police Department, which was extended through June 17, 2022, Case No. 2:21-mj-04818-DUTY.

19.    While the second phone was locked and its contents could not be decrypted, the first phone (recovered from the windshield) contained extensive messages on the "Signal" messaging app between CONDITO and other individuals relating to narcotics dealing, including but not limited to the following:

      a.    On an unknown date, CONDITO sent the following Signal messages to an individual saved in CONDITO's phone as

8

"Anna": "Anna do you have any more 30 mg ir Addy's? Can I cop them? . . When can I get the 1K. . . Hey so I want to order those items fot you before I get arrested."

      b.  On an unknown date, an individual saved in CONDITO's phone as "Eric Heaton" sent the following Signal messages to CONDITO: "If you find me a small amount of black I'd be down," to which CONDITO replies "I got it rn. A large amount . . . Let me know I need foil. I'll plug u. Got Alp powder too." Based on my training and experience, narcotics dealers and users use "black" as slang to refer to black tar heroin.

      c.  On an unknown date, CONDITO sent Signal messages to an individual saved in CONDITO's phone as "Mantis" that included photographs of blue bars, suboxone strips, test kits for MDMA purity and cocaine purity, a white substance on a gram scale, and messages that referenced "Molly" and "coke." Based on my training and experience, narcotics dealers and users use "molly" as slang to refer to refer to MDMA/ecstasy and "coke" to refer to cocaine.

      d.  On an unknown date, CONDITO sent the following Signal messages to an individual saved in CONDITO's phone as "Marissa": "I sell mine drugs j. A eeem hen she died na month. . . 2 zips of ice are in taken from the xan bag as well as a roll of thizzles." Based on my training and experience, narcotics dealers and users use "ice" as slang to refer to refer to methamphetamine.

20. In addition, in Signal messages on CONDITO's phone with third parties, CONDITO discusses efforts to evade law enforcement, including but not limited to the following:

    a. On an unknown date, CONDITO sent the following Signal message to an individual saved in CONDITO's phone as "Marissa": "LE is all over me here.bd careful no safe. . ." Based on my training and experience, I understand "LE" to be short hand or slang for "law enforcement."

    b. On an unknown date, CONDITO sent the following Signal messages to an individual saved in CONDITO's phone as "Eric Heaton": "My splot blow . . . . Cops there are there looking for me all the time . . ." Based on my training and experience and knowledge of the case, I believe that CONDITO was trying to say that "spot" but mistyped it as "splot." Based on my training and experience, the word "blow" is slang for when something is bad. As a result, I understand CONDITO to be saying that he does not like where he lives because law enforcement is often times there investigating his illegal activities.

    c. On an unknown date, CONDITO sent the following Signal messages to an individual saved in CONDITO's phone as "Mantis": "Yo. Cops don't know Enough about me for a warrant, but they're trying very hard."

21. Based on my training and experience and knowledge of the case, and in light of these messages, I believe that CONDITO is trying to avoid detection by law enforcement in relation to his narcotics dealing activities.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

11

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    e. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    f. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

14

25. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

i. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CONDITO's thumb and/or fingers on the

15

device(s); and (2) hold the device(s) in front of CONDITO's face with his open to activate the facial-, iris-, and/or retina-recognition feature.

26. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

27. For all of the reasons described above, there is probable cause to believe that CONDITO has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of violations of the Subject Offenses, will be found in a search of the locations described in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 16th day of June, 2022.

THE HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE